**ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs,**

v.

**Robert FROEHLKE, Secretary of the Army, et al., Defendants,**
**and**
**City of Osceola, Missouri, et al., Defendants-Intervenor.**

No. 20164–1.

United States District Court,
W. D. Missouri, W. D.

Sept. 13, 1972.

Memorandum Opinion Oct. 10, 1972.

Edward Lee Rogers, East Setauket, N. Y., Arthur A. Benson, II, Kansas City, Mo., for plaintiffs.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., David M. Proctor, Jr., Asst. U. S. Atty., Kansas City, Mo., for Federal defendants.

Lyman Field, Reggie C. Giffin, Kansas City, Mo., for City of Osceola, Mo., et al.

F. Phillip Kirwan, Patrick E. Hartigan, Kansas City, Mo., for Tobin Const. Co.

John C. Danforth, Atty. Gen. State of Missouri, Walter W. Nowotny, Jr., Asst. Atty. Gen. State of Missouri, Jefferson City, Mo., for State of Missouri.

William H. Bates, Joseph E. Stevens, Kansas City, Mo., for Guy F. Atkinson Co.

John Manning, Kansas City, Mo., for Operating Engineers Local No. 101.

JOHN W. OLIVER, District Judge.

## MEMORANDUM AND ORDER

### I.

Plaintiffs' complaint for injunction and declaratory judgment, filed March 6, 1972, alleged that their action arose under the National Environmental Policy Act of 1969 (NEPA), 42 United States Code §§ 4321 et seq.; the Fish and Wildlife Coordination Act of 1934, as amended, 16 United States Code §§ 661 et seq.; the Environmental Quality Improvement Act of 1970, 42 United States Code § 4371; the Water Bank Act of December 19, 1970, 16 United States Code §§ 1301 et seq.; the Acts of June 20, 1938, 33 United States Code §

540; the Act of June 22, 1936, 33 United States Code, § 701a; the Act of June 27, 1960, 16 United States Code §§ 469–469c; the Fifth and Ninth Amendments to the Constitution of the United States, and the Public Trust Doctrine, which is allegedly a part of the federal common law.

Plaintiffs' complaint of 112 paragraphs alleged eight separate causes of action. Its prayer for relief prayed that this Court "as soon as practicable hold a hearing, at which all parties may present oral and documentary evidence, with regard to the issuance of a preliminary injunction, enjoining and restraining defendants, pending final disposition of this suit, from initiating, continuing with, or completing the construction of the Harry S. Truman Reservoir project." Plaintiffs prayed that upon final hearing "this Court issue its permanent injunction, enjoining and restraining defendants from continuing with or completing the construction of the Harry S. Truman Reservoir project." [1]

At the close of the case and after completion of the procedures described in part III of this opinion, plaintiffs presented a form of final judgment in which they suggested that the defendants be "permanently enjoined from continuing the construction of the project known as the Harry S. Truman Reservoir and Dam Project in the following respects, unless and until they prepare and circulate to all relevant agencies, the Council on Environmental Quality, and make available to the public, a draft environmental statement and thereafter file with the Council on Environmental Quality a 'detailed statement' within the meaning of Section 102(2)(C) of the National Environmental Policy Act of 1969 . . . . "

The defendants-intervenors, on the other hand, suggest that our final judgment need only order that the parties comply with the provisions of the Stipulations entered into during the course of this litigation (which will be later described in detail) and that, except for that affirmative relief, plaintiffs' prayer for temporary and permanent injunction, and all other relief, should be denied.

We have determined that plaintiffs are not entitled to the blanket injunctive relief they seek. We have concluded that plaintiffs are entitled to have the Stipulations incorporated by reference into this Court's final judgment to the end that time schedule and other procedures therein provided be subject to this Court's continuing jurisdiction. Plaintiffs are, of course, entitled to judicial supervision and enforcement of those portions of the Stipulations under which defendants have, among other things, voluntarily agreed neither to schedule nor award particular future contracts prior to completion of the Environmental Impact Statement required by § 102(2)(C) of NEPA.

II.

It must be recognized at the outset that this case is not "ordinary, run-of-the-mill litigation," to borrow language from Mr. Justice Blackmun's dissent in *Sierra Club v. Morton*, 405 U.S. 727, 755, 92 S.Ct. 1361, 1376, 31 L.Ed.2d 636 (1972). It involves, as did *Sierra Club*, "Significant aspects of a wide, growing, and disturbing problem, that is, the Nation's and the world's deteriorating environment with its resulting ecological disturbances" [Ibid at 755, 92 S.Ct. at 1376]. *Sierra Club* was decided shortly after this case was filed. The decision in that case went off on the question of

---

1. Plaintiffs' prayer for declaratory relief sought a declaration "that the defendants' actions in construction and continuing to construct the Harry S. Truman Reservoir project are in violation of the statutes and other laws on which the above pleaded eight causes of action are based."

In light of the procedures developed and followed during the course of this litigation, plaintiffs did not suggest any findings of fact or conclusions of law to support their prayer for declaratory relief.

plaintiffs' standing. Accordingly, this, and other lower federal courts did not receive the benefit of Supreme Court guidance in regard to how NEPA cases should be processed.

■ Mr. Justice Blackmun's dissent recognized, however, that "[our] existing methods and the traditional [procedural] concepts do not quite fit" a case of this sort [Ibid at 755, 92 S.Ct. at 1376]. Counsel for all parties accepted the implicit challenge in Mr. Justice Blackmun's observation and sought to devise new procedures for processing environmental litigation which would avoid the expense and delay which has been encountered in other environmental cases. Although Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), involved § 4(f) of the Department of Transportation Act of 1966 and § 138 of the Federal-Aid Highway Act of 1968, certain principles stated in that case were deemed to be applicable to cases arising under NEPA.[2] That case made clear that the threshold question of whether the plaintiffs there involved were entitled to judicial review was easily answered. Section 701 of the Administrative Procedure Act, 5 United States Code § 701, was held to so provide in light of the fact that Congress gave no indication that judicial review was prohibited by either the Department of Transportation Act or the Federal-Aid Highway Act. We believe the same thing must be said of NEPA. Accordingly we conclude that plaintiffs are entitled to the judicial review they seek.

*Overton Park* noted, however, that the determination of "the existence of judicial review is only to start; the standard of review must also be determined" [Ibid at 413, 91 S.Ct. at 822]. That case concluded, in language applicable to this case, that to find the standard for judicial review "we must look to § 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1964 ed., Supp. V.), which provides that a 'reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found' not to meet six separate standards" [Ibid. at 413, 91 S.Ct. at 822]. Section 706 generally provides that "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."

Specifically, Section 706 provides that "the reviewing court shall (1) compel agency action unlawfully withheld or unreasonably delayed." It also specifically provides that the reviewing court shall "hold unlawful and set aside agency action . . . found to be—(A) . . . not in accordance with law. . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (D) without observance of procedures required by law."

*Overton Park* concluded in regard to agency action required by the Department of Transportation Act of 1966 and the Federal-Aid Highway Act of 1968, which is quite similar to action required by NEPA, that "the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry" and that "the court is first required to decide whether the Secretary acted within the scope of his authority" [Ibid at 415, 91 S.Ct. at 823]. That case pointed out, however, that "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one" and that the reviewing court "is not empowered to substitute its judgment for that of the agency" [Ibid, 416, 91 S.Ct. at 824].

2. Indeed, the first sentence of *Overton Park* cited NEPA to support the opening sentence of that opinion which stated: "The growing public concern about the quality of our natural environment has prompted Congress in recent years to enact legislation designed to curb the accelerated destruction of our country's natural beauty."

We believe that Calvert Cliffs Coord. Com. v. United States, A. E. Comm. (1971), 146 U.S.App.D.C. 33, 449 F.2d 1109, 1122, stated the obvious when it concluded that "The sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action." Section 101 of NEPA requires the federal government to "use all practicable means and measures" to protect environmental values. Section 102 explicitly states that "congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act. . . . " And Section 102(2)(C) explicitly requires that officials of all responsible agencies of the Federal Government shall prepare a "detailed statement" (which has become known as the "environmental impact statement" or "EIS") covering the impact of particular agency action on the environment, the environmental damage which may be avoided, and alternative measures which should be given appropriate consideration by both the immediate and ultimate decision-makers before a particular project is recommended, authorized and financed. And, as stated in *Calvert Cliffs*, it is clear that the Congress did not intend for the Act to be a "paper tiger" [Ibid at 1114].[3]

In this case no one ever attempted to contend with any vigor that NEPA is not applicable to the Truman Reservoir and Dam project. And no one has ever attempted to claim that an environmental impact statement has ever been prepared in accordance with the Congressional mandate. But the attitude of the Corps of Engineers toward NEPA so far as the circumstances of this case are concerned stands in sharp contrast with

the apparent attitude of the Atomic Energy Commission, as reflected in the *Calvert Cliffs* case, and that of the Department of Transportation as reflected in *Overton Park* and in Named Ind. Mem. of San Antonio Con. Soc. v. Texas Hy. Dept. (5th Cir., 1971), 446 F.2d 1013. (See also 400 U.S. 968, 91 S.Ct. 368, 27 L.Ed.2d 388 for Mr. Justice Black's description of that attitude in his dissent from denial of certiorari in the San Antonio case.) In this case it is undisputed that the Corps of Engineers had recognized its duty to prepare and consider a proper EIS and had in good faith taken substantial and concrete steps in that direction quite some time before the pending action was even filed. It is also undisputed that the Corps of Engineers is completing its work on the EIS as fast as that work can be done under the circumstances.

The fact that it is easy to answer the threshold question presented in regard to plaintiffs' right to judicial review and the fact it is easy to determine that the defendants did in fact proceed with agency action "without observance of procedure required by law," within the meaning of § 706(2)(D) of the Administrative Procedures Act in that no EIS has been prepared in accordance with the mandate of § 102(2)(C) of NEPA, does not provide an answer, easy or otherwise, to the most difficult question presented in this case. That question is what relief should be granted between now and the time that NEPA will have been complied with.

Section 706(1) of the Administrative Procedure Act requires that the reviewing court "compel agency action unlawfully withheld or unreasonably delayed." But neither that section nor any other section of the Administrative Procedure Act suggests what order should be entered to cover the period of time during

3. *Calvert Cliffs* appropriately quoted the statements of Senator Jackson, NEPA's principal sponsor, to the effect that "[n]o agency will [now] be able to maintain that it has no mandate or no requirement to consider the environmental con-

sequences" and his characterization of Section 102 as "action forcing" and his comment that unless so considered, "these lofty declarations [in Section 101] are nothing more than that" [Ibid, 449 F.2d 1113].

which the particular agency takes proper steps to correct its failure to observe procedures required by law. In short, the difficult question presented is what additional relief, if any, should be granted, under the circumstances of this case, including, but not limited to judicial enforcement and supervision of the Stipulations to which the parties have agreed, between now and the time it can fairly be determined that defendants have appropriately complied with all the procedural requirements of NEPA and any other applicable law.

To the great credit of all the parties and their respective counsel, this new and difficult question was placed in focus in the early stages of this litigation. Recognition of that question permitted the design of procedures which may assist other courts in their processing of this new and unique type of litigation. It is for that reason that we shall state in some detail the chronology of how this case was processed.

### III.

This case was filed March 6, 1972. The first pretrial conference was held on the morning of March 29, 1972. Counsel for plaintiffs and defendants agreed upon procedures which would permit intervention by any and all interested parties. Thereafter, pursuant to those agreed procedures, the City of Osceola, et al., J. A. Tobin Construction Co., et al., Guy F. Atkinson Company, Hoisting and Portable Engineers Local No. 101, et al., and the State of Missouri, were permitted to intervene on the side of the defendants. The present 173 defendant-intervenors include four agencies of the State of Missouri, five county governments, seven towns, two not-for-profit associations, six contractors and trade associations, twelve labor unions or labor councils and one hundred and forty individuals. The processing of this case was not complicated by the intervention of the numerous parties. For the most part, two law firms took the lead in representing the intervenors. Indeed, we are confident that the case

was simplified rather than complicated by freely allowing intervention because no time was wasted in regard to any disputed questions which related to parties or their standing.

The Court directed counsel to utilize the afternoon of March 29, 1972 to become acquainted with the status of the various construction contracts and other activities on the project which might voluntarily be suspended pending a prompt hearing on the merits and thus avoid the necessity for consideration of a temporary restraining order. Colonel W. R. Needham, District Engineer at Kansas City, appeared with four members of his staff and outlined in full detail (beginning with the first contract which had been awarded on July 15, 1963) the status of all contracts running through and including the last contract awarded February 10, 1972. He advised the Court and counsel that Stages I and II of the dam construction had both been completed; that Stage III of the dam construction was partially completed; and that Stage IV (final construction) would not start until early 1973. Counsel were advised that dam closure was not scheduled until sometime in 1976. He outlined all contemplated road relocations, all other contracts, past, present and future, and answered any and all questions relating to the project, including past, pending, and future land acquisitions. Col. Needham stated that he and his staff would continue, as they had in the past, to extend to all parties full and complete disclosure of any data, facts, or information desired by them from the Corps of Engineers. This policy, to the Court's knowledge, has been faithfully carried out.

The second pretrial conference was held on April 6, 1972. A report was made to the Court in regard to the tour of the project area conducted by the Corps of Engineers at the request of the plaintiffs' counsel, and participated in by all counsel. The Court then, upon agreement of counsel, dispensed with formal pretrial discovery in favor of complete and immediate disclosure of all

relevant documentary evidence. Counsel agreed to prepare lists of witnesses to be called and to provide opposing counsel with a full summary of their testimony, by affidavit or otherwise. Counsel agreed to submit proposed stipulations of fact, listing of all documentary evidence as exhibits, as a prelude to the hearing on the merits of plaintiffs' prayer for temporary and permanent relief which was scheduled for May 22, 1972. The promptness with which the hearing on the merits was set avoided the necessity of ruling upon any request for temporary restraining order.

The Court announced at the April 6, 1972 pretrial conference that Phase I of this case would be plaintiffs' compliance with the above pretrial procedures by April 21, 1972. Phase II of the case would be defendants' and intervenors' compliance with those directed procedures by May 15, 1972. Phase III required counsel, in anticipation of the May 22, 1972 hearing, to enter into stipulations in regard to all undisputed factual data presented by the respective parties under Phases I and II of the case. Two separate stipulations were contemplated, one covering documentary evidence, the other testimonial evidence. Phase IV of the case, of course, was the hearing on the merits scheduled to commence on May 22, 1972.

On April 17 and 18, 1972, at conferences with the Court, it was agreed that land acquisition for rights-of-way and rights of entry would proceed. The Corps outlined six categories of other land acquisition as follows: (1) offers to sell in process of acceptance; (2) negotiations in process; (3) appraisals received—negotiation not initiated; (4) offers in process of signature by owners; (5) negotiations suspended—awaiting new appraisals; and (6) ownerships referred for condemnation. It was agreed that acquisitions in these categories could proceed, except that in categories (2), (3), and (5) a letter would be given to the landowner by the government advising him that his land acquisition could be held in abeyance for the remainder of fiscal year 1972, pending resolution of the case, or proceed, as he might choose, if he executed appropriate waivers. No new condemnations were contemplated under category (5).

Phase I of the case was completed on schedule by plaintiffs filing their pretrial statement of the case. Thirty-seven witnesses were listed. Plaintiffs filed excellent summaries or affidavits concerning the testimony each witness would give. Plaintiffs served copies of over 160 exhibits which plaintiffs proposed for inclusion in the contemplated stipulation of documentary evidence.[4] Plaintiffs prepared carefully drawn proposed stipulation of ultimate facts, consisting of 311 separate paragraphs, together with a concise statement of plaintiffs' views in regard to the legal and factual issues presented.

Phase II was completed on schedule by defendants' filing on May 15, 1972 their pretrial statement of the case in which 76 witnesses were listed, together with a summary of their testimony, usually in affidavit form, 81 major exhibits, many with various subparts, were proposed by defendants for inclusion in the contemplated stipulation of documentary evidence. Great progress was made during Phase III in regard to the other contemplated stipulation of undisputed facts, defendant-intervenors indicating their acceptance of a very substantial portion of plaintiffs' proposed stipulation.

Counsel for all parties cannot be commended highly enough for their cooperation with each other and with the Court in connection with their successful effort to design and follow procedures which eventually eliminated the lengthy hearings that have characterized some

4. The proposed stipulation of documentary evidence required counsel only to agree to the authenticity of a particular exhibit. All objections to materiality and relevancy were, by agreement, reserved. Many, if not most, of the exhibits proposed by all parties were public records or scientific writings within the judicial notice of the Court.

of the cases in this rapidly developing area of public law. Cf. Citizens to Preserve Overton Park, Inc. v. Volpe (W.D. Tenn., 1972), 335 F.Supp. 873, in which a twenty-five day trial was had after the Supreme Court's remand of that case to the district court.[5]

Pretrial briefs were filed on May 19, 1972. The hearing on the merits commenced May 22, 1972. After only a three and a half day hearing, during which plaintiffs introduced the testimony of several expert witnesses on fish and wildlife aspects of the project, on economics, and on flood control benefits, the parties entered into a full stipulation which concluded Phase IV of the case. That stipulation provided:

### STIPULATION [On Phase IV]

The parties agree that for the purpose of this case, including the determination of any equitable relief:

1. That upon the admission into evidence of all the plaintiffs' and defendants' affidavits, summaries and documents, it is stipulated and agreed that there will be significant environmental impact as a result of this project as presently planned in the following areas:

(a) The Osage Basin fish fauna, including impacts on the paddlefish, blue catfish, striped bass, and walleye;

(b) Archaeological and paleontological sites;

(c) Wildlife habitat, including habitat for deer and turkey, with resulting impacts on populations of wildlife species;

(d) Waterfowl habitat, including the Schell-Osage Wild Life Area, and other wetlands in the Osage Basin;

(e) Potentiality on mussels in the Osage River and tributaries; and

(f) Society, agriculture, and economics;

and that, for the present, the need for further oral testimony from either plaintiffs or defendants may be dispensed with.

2. That instead, the parties should now turn to and explore with the Court Phase V, as outlined by the Court from the bench at the start of this morning's session, May 25, 1972.

3. That all rights are reserved to both sides to apply for a reopening of the Phase IV hearing should the procedures now contemplated break down.

■ Our approval of the Stipulation on Phase IV obviated the necessity for hearing any additional evidence. The Court made clear, early in the hearing, and all parties came to recognize that neither NEPA nor any of the other stat-

5. Named Ind. Mem. of San Antonio Con-Soc. v. Texas Hy. Dept., (5th Cir., 1971) 446 F.2d 1013, shows that the San Antonio park case was originally filed in December, 1967. The District Court did not act until November, 1970 when the District Court rendered summary judgment for the defendants. On December 7, 1970, the Supreme Court granted a stay on condition that a petition for certiorari before judgment in the Court of Appeals would be promptly filed. See 400 U.S. 939, 91 S.Ct. 231, 27 L.Ed.2d 262. Later in December, 1970, the petition was filed but the stay was vacated and certiorari was denied, over the dissent of four Justices. See 400 U.S. 961, 91 S.Ct. 361, 27 L.Ed.2d 381, and 968, 91 S.Ct. 368, 27 L.Ed.2d 388. The Court of Appeals eventually reversed the District Court on August 5, 1971, and stopped construction until full compliance with the law. See 446 F.2d 1013, 1029.

The latest chapter of the San Antonio park case is apparently being written in Congress. Section 147 of S.3939, 92d Congress, 2d Session, the proposed Federal-Aid Highway Act of 1972, contains a provision which in effect, would reverse the Court of Appeals decision. Senate Report 92–1081 to accompany S.3939, under date of August 18, 1972, p. 42, shows that a majority of the committee aproved the proposed action. Only Senator Bulkley expressed the fear that Congressional intervention in cases which pend before the courts could destroy the effectiveness of statutes such as NEPA and Section 4(f) of the Department of Transportation Act. See p. 66 of Senate Report 92–1081.

utes upon which plaintiffs relied vested the courts with either power or jurisdiction to evaluate the merits or balance the conflicts revealed by an appropriate environmental impact statement. Because the Congress placed that decision elsewhere, the only finding that a court may properly make in a NEPA case is whether the evidence shows that a significant environmental impact would in fact result from the construction of the particular project. Once the parties in this case agreed that such would in fact result from the construction of the Truman Reservoir, there was no necessity for listening to days of testimony to establish that rather obvious fact.

The hearing was therefore concluded. Negotiations were undertaken by the parties on May 25 and 26, 1972, under the Court's supervision which resulted in the Stipulation on Phase V which provided a schedule for the submission of the draft and final environmental impact statement. That stipulation provided:

## STIPULATION ON PHASE V

In accordance with the agreements and understandings reached by all counsel in conference with the Court on May 26, 1972, respecting Phase V in this case, providing for the scheduling and processing of a Section 102(2)(C) Statement, it is stipulated and agreed:

1. By *July 31, 1972*, the Corps of Engineers will receive:

(a) From Midwest Research Institute the contracted-for data for inclusion in the draft EIS as an Appendix, a copy of which will be delivered to plaintiffs' attorneys, and

(b) From the plaintiffs, in single or multiple volume form, all the data, comments and statements desired by them for inclusion in the draft EIS as an Appendix, and following an outline of topics

and subjects to be supplied by the Corps to plaintiffs promptly upon the execution of this stipulation.

2. By *September 15, 1972*, The Corps of Engineers will have assembled and distributed the draft EIS for comment to all the agencies contemplated by NEPA and the CEQ guidelines, including the plaintiffs through their attorneys; and in such draft EIS the items in 1(a) and (b) above, will be included as Appendices. In thus distributing the draft EIS the Corps will call attention of all distributees to the importance that comment must be received (except for EPA) by October 15, 1972, unless the time is extended by order of the Court for good cause shown by any particular agency.

3. By *October 15, 1972*, the Corps of Engineers will:

(a) Receive all comments from the agencies (except EPA), unless extended for good cause shown by the Court,

(b) Receive from plaintiffs their comments, together with any additional data and statements which they had been unable to supply under 1(b) above,

(c) Begin preparation of the final EIS.

4. By *October 30, 1972*, the Corps will receive the EPA comments.

5. By *January 31, 1973*, the Corps of Engineers District Office will forward the proposed final EIS to the Chief of Engineers. Plaintiffs, through their attorneys, will receive a copy at such time.[6]

6. By *March 1, 1973*, the final EIS will be filed with the CEQ.

7. Should newly discovered data or knowledge be acquired and forwarded to the Corps by plaintiffs in the interim between October 15, 1972 and March 1, 1973, too late for formal inclusion or in-

6. Washington counsel for the defendants objected to the last sentence of this paragraph. The Court overruled that objection for reasons stated of record. All other portions of this stipulation were agreeable to all parties.

tegration into the final EIS, the same will be attached as an Appendix.

8. In preparing the EIS, both draft and final, the Corps of Engineers will be mindful of both the spirit and the letter, as far as possible, of the plaintiffs' conference suggestions, hereby agreed to, that:

(a) There shall be specific findings of statements of fact for each area of concern.

(b) Statements of fact shall identify data upon which based.

(c) Data relied upon shall be identified by source and author, and in case of governmental reports, giving the name and nature of the report and underlying data.

(d) Preliminary or final conclusions recommending proposed courses of action shall identify the data upon which they are based.

9. The parties will now turn to and explore with the Court Phase VI as outlined by the Court from the bench on May 25, 1972.

10. All rights are reserved to both sides to apply for a reopening of the Phase IV hearing should the procedures now contemplated break down.

11. The Court will retain plenary control of these proceedings throughout the schedule herein adopted.

In accordance with the stipulation, the parties thereafter filed briefs on the question of what additional injunctive relief, if any, should be granted. Subsequently, a conference on that question was held on June 21 and 22, 1972, resulting in the first stipulation on Phase VI of the case. That stipulation provided:

## STIPULATION ON PHASE VI

In accordance with the agreements and understandings by all counsel in conference with the Court on June 21–22, 1972, respecting Phase VI of this case, it is stipulated and agreed:

1. That it has been impossible for the parties to reach agreement on all facets of the questions presented in Phase VI of this case. The parties are, however, without waiving their respective legal contentions in regard to any question, able to stipulate and agree upon matters and procedures which will state their respective positions in a manner that is calculated to facilitate the judicial determination and possible judicial review of this Court's determination of particular questions presented. The purpose of this stipulation is to accomplish that objective.

2. *Stipulation on Phase V.* All parties are in agreement with all paragraphs of that stipulation excepting only that the Federal Defendants are unable to agree to the last sentence of paragraph 5 thereof. The Federal Defendants' position in regard to the last sentence of paragraph 5 is stated in a letter addressed to the Court dated June 15, 1972 by David R. Warner, Chief, General Litigation Section, Land and Natural Resources Division of the Department of Justice, and in the Federal Defendants' Phase VI briefs heretofore filed, and has been ruled on by the Court.

3. *Ongoing Contracts.* The parties agree that D. Ex. 1r accurately sets forth certain data concerning the ongoing contracts as of May 15, 1972. One additional contract in the approximate amount of $23,800 (No. 72–C–0170), for clearing at Osceola, was awarded on June 14, 1972.

Plaintiffs contend that they are entitled to injunctive relief in regard to Contracts Nos. 71–0043 (Stage III Construction), 72–0101 (State Highway Relocations 4 and 5), and 68–C–0131 (Turbines), referred to in D. Ex. 1r. Defendants and Intervenors oppose this position.

The parties agree that the Court shall decide whether plaintiffs are entitled to the relief requested.

Except as hereinafter stated, plaintiffs agree to seek no equitable relief with regard to the other ongoing contracts referred to in paragraph 3.

4. *Future Contracts.* As presently planned, certain future contracts are not scheduled to be advertised and awarded prior to completion of the Environmental Impact Statement. These are the contracts, the references for which have been lined out in D. Ex. 101a. If there is an acceleration of them on this schedule to a date prior to July 1, 1973, defendants will give plaintiffs two weeks written notice prior to advertising.

Plaintiffs agree not to seek injunctive relief as to Road Relocation, Contract for Relocations SC–31 and SC–36 (Brown's Ford Bridge), and Missouri State Highway Relocation 27, and defendants agree not to remove the County Line Bridge until after July 1, 1974.

Plaintiffs contend they are entitled to injunctive relief with regard to all other future contracts, particularly, that the advertising of bids and the awarding of contracts thereon be enjoined. Defendants and intervenors oppose this position, but for any advertising for bids prior to entry of judgment by this Court defendants will give two weeks written notice thereof to plaintiffs' counsel.

5. *Land Acquisitions.* Plaintiffs seek to enjoin further land acquisitions for the project except that in the so-called checker-board area (i. e., where there are already extensive federal holdings) plaintiffs request only that the currently used letter giving the landowners the right to refuse to negotiate be given to them prior to the initiation of negotiations. Defendants and intervenors oppose this position.

6. *Admissibility of Evidence.* The parties agree to the admissibility of all documentary evidence to be submitted by plaintiffs not later than July 7, 1972, and by defendants not later than July 14, 1972. Additional documentary and oral evidence may be adduced only upon order of the court for good cause shown. All such evidence is admitted subject to the objections reserved in the stipulation entered into by the parties at the outset of this litigation.

7. *Issues.* Parties agree that the Court may decide the questions presented on the entire record and stipulations.

8. *Schedule.* Plaintiffs will submit their suggested findings of fact and conclusions of law (hereinafter "brief") not later than July 24, 1972; defendants and intervenors are to file their brief within 30 days after receipt of plaintiffs' brief, and plaintiffs shall file their reply brief within 15 days after receipt of defendants' and intervenors' brief.

Copies of opinions not officially reported shall be provided by counsel relying upon them as appendices to their briefs.

Plaintiffs thereafter, on July 24, 1972, in accordance with the Phase VI stipulation schedule, filed their proposed findings of fact, conclusions of law and brief in support. Subsequently, at a conference before the Court, requested by plaintiffs, agreement on Supplemental Stipulation on Phase VI was reached and filed on July 31, 1972. That stipulation provided:

SUPPLEMENTAL STIPULATION ON PHASE VI

1. The parties heretofore have been unable to reach full agreement in regard to a Phase VI stipulation.

2. They recognize, however, that such failure was primarily related to the extent of equitable relief, if any, which should be granted during the period of time the schedule stipulated in their Phase V stipulation is being carried out.

3. The difficult question of the extent of such relief has been the subject of lengthy and comprehensive discussion. In order that the questions which may be presented for appellate review be narrowed, the parties, upon conference with the Court on July 26, 1972, agree that the following limitations, hereby agreed to, upon actions which otherwise could be taken by the federal defendants may be included in a final judgment, so that

final judgment may now be more expeditiously entered in this case:

A. Any future land acquisitions up to July 1, 1973 shall be only as follows:

(1) All right of way lands necessary to any road relocation contracts, which would include all contiguous acreage in a single tract ownership interest, shall proceed without any restriction.

(2) Any landowner, anywhere, who wants to either negotiate or proceed to condemnation may be permitted to do so, providing he has first received a letter advising of his right to refuse to negotiate pending this litigation.

(3) Any landowners who, since April 18, 1972, have not received the letter referred to above shall be promptly advised that they have the right to withdraw from negotiations if they expressly waive their rights under Public Law 91–646, under the same conditions outlined herein relating to future acquisitions, but this paragraph does not apply to right of way acquisitions covered in subparagraph (1) above.

B. Future contracts:

(1) Awards of contracts for the procurement of power plant equipment (generators and accessories, governors, bridge cranes, gates and bulkheads, and gantry cranes) shall be deferred by the Corps of Engineers until July 1, 1973, or until further order of the Court, whichever shall be sooner.

(2) Awards for all future contracts lined-out in Defendants' Exhibit 101A, entitled Future Work, shall not be accelerated to a date before July 1, 1973, unless otherwise ordered by the Court.

4. The parties recognize plaintiffs have consistently maintained, and continue to maintain, they were and are entitled to more relief than agreed to by this and earlier stipulation; and that contrariwise, defendants and intervenors have consistently maintained, and continue to maintain, the plaintiffs were and are not entitled to any relief they have sought, or to that consented to by this and earlier stipulation.

5. All parties agree that it is to their mutual interest to narrow the issues presented in this case and that their agreements upon relief to be granted, as provided in paragraph 3 of this stipulation and in stipulation V are consistent with that objective and their respective positions as stated in paragraph 4.

6. It is understood that plaintiffs, by entering into this stipulation, do not waive any rights that they may have to seek appropriate appellate review of the question of whether they may be or were entitled to more relief than that agreed to by this and earlier stipulation.

It is further understood that should plaintiffs seek appellate review of the final judgment of this Court, herein contemplated, neither the defendants nor any of the intervenors, by entering into this stipulation, shall be considered to have in any way waived their right to contend on cross-appeal or otherwise that plaintiffs are and were not entitled to any equitable relief under the circumstances.

7. The parties agree and hereby request that a final judgment be entered by the Court at an appropriate stage in these proceedings.

8. The parties ask they be afforded the opportunity to seek agreement upon such language as they might mutually agree should be included in full final judgment of this Court; but they recognize that procedures should be established to cover a failure to reach such agreement; and, accordingly, it is agreed that the parties may have until August 4, 1972 within which to present a form of final judgment which all parties agree should be entered. In the event of failure to reach agreement, defendants and intervenors shall attach a copy of their

own suggested form of final judgment to their answer brief as provided in paragraph 9. Plaintiffs shall attach a copy of their own suggested form of final judgment to their reply brief as provided in paragraph 9.

9. The parties agree that defendants and intervenors shall prepare, serve, and file their final answer brief to plaintiffs' post-trial brief on or before August 14, 1972.

Plaintiffs shall prepare, serve, and file their final reply brief within 1 week after receipt of defendants' brief.

10. The parties agree that, in light of this supplemental Phase VI stipulation, it is not necessary for any of the parties to further comply with the procedures heretofore directed in regard to specific suggested findings of fact and suggested conclusions of law.

Thereafter, on August 3, 1972, in accordance with that stipulation, plaintiffs submitted to the Court, and served on defendants and intervenors, plaintiffs' final proposed findings of fact, conclusions of law, and a suggested form of judgment. Defendants and intervenors, on August 14, 1972, responded by filing their final suggested findings of fact, conclusions of law, and suggested form of judgment. And on August 21, 1972, plaintiffs filed an appropriate response to defendants' and intervenors' suggestions. Those filings clearly established substantial areas of agreement between the parties on most of their respective suggested findings of fact and in regard to some conclusions of law. Our formal findings and conclusions, which generally follow the pattern of the parties' suggestions, will be set forth in part VI and VII respectively of this opinion in order to facilitate and simplify any appellate review which any party may wish to seek. Other findings and conclusions made and stated in other parts of this opinion are, of course, to be considered together with our formal findings and conclusions pursuant to Rule 52 of the Rules of Civil Procedure.

In part IV and V we will set forth the reasons why we believe the final judgment and decree should be entered as we shall direct and why we reject plaintiffs' basic argument that they are entitled to a blanket injunction and to more equitable relief than that afforded by the final judgment and decree.

## IV.

The final judgment and decree in this case approves and provides for retention of jurisdiction over the procedures established and judicially approved in the various Stipulations entered into by the parties during the course of this case. Pursuant to those Stipulations counsel for the plaintiffs have already received (on July 31, 1972) a copy of the data the Corps of Engineers contracted for from Midwest Research Institute which may be included as an appendix to the draft EIS. Plaintiffs were afforded the right under the approved Stipulation to present and they did in fact present to the Corps of Engineers on July 31, 1972 all data, comments and statements which plaintiffs desired to have included in the draft EIS. That document, 192 pages in length, follows the topic and subject matter format which the Corps of Engineers agreed to and did furnish plaintiffs pursuant to the Phase V Stipulation. We know of no other environmental case in which the plaintiff has been granted a legal right to present his ideas and arguments in his own language at this stage in the development of an EIS.

Distribution of the draft EIS is scheduled for September 15, 1972. Under the Phase V Stipulation plaintiffs are afforded an opportunity to present their written comment on the draft EIS by October 15, 1972, and to attach any additional data and statements which they believe should be given appropriate consideration.

The EPA is scheduled to submit its comments on the draft EIS by October 30, 1972, and to attach any additional data and statements which they believe should be given appropriate consideration.

The EPA is scheduled to submit its comments on the draft EIS by October 30, 1972. The Corps of Engineers District Office will forward the proposed final EIS to Chief of Engineers by January 31, 1973. The Court has required, over the defendants' objection, that a copy of that proposed final EIS be forwarded simultaneously to counsel for the plaintiffs so that they may have the maximum time for consideration of that proposed final EIS under the circumstances.

The final EIS is scheduled for filing with the CEQ on or before March 1, 1973. In order that some of the questions presented in *Overton Park* and other cases be avoided, the Corps of Engineers committed itself in its preparation of the EIS to be mindful of both the spirit and the letter of the parties' conferences with the Court. Defendants have specifically agreed to make specific findings or statements of fact for each area of concern. They have agreed to identify the data upon which such findings or statements are based and to support both their preliminary and final conclusions recommending particular courses of action with similar citation and identification of data. Those procedures were designed to assure both procedural and substantive compliance with NEPA. Broadly speaking, the requirements concerning the form and substance of the EIS utilize the successful experience established by proper use of Rule 52 of the Rules of Civil Procedure.

Paragraph 11 of the Phase VI stipulation recognized that "the Court will retain plenary control of these proceedings throughout the schedule herein adopted." We insisted upon the inclusion of that paragraph in the stipulation to assure ready access to the Court to hear and determine the claim of any party that the procedures scheduled were not being timely and conscientiously followed.

The prime objective and purpose of the Phase V Stipulation was to establish the most practicable, expeditious procedures for completion of the preparation of an EIS which would serve as a model for other Corps of Engineer projects and for the projects of other federal agencies. Those procedures afford plaintiffs the fullest possible opportunity to present their ideas and comments in their own language for fair consideration by all decision making agencies, including the ultimate decision maker, the Congress of the United States. In addition, the procedures and the time schedule approved by our final judgment and decree include appropriate provision for judicial supervision, should the necessity arise, and an orderly method of determining whether the EIS as finally prepared is in both form and substance the type of "detailed statement" contemplated by NEPA and other applicable law.

In light of the statements of the parties and their counsel during their conferences with the Court concerning the spirit in which the procedures will be followed, we entertain considerable doubt whether any party will deem it necessary to seek additional judicial action. But that feeling, assuming it may prove to be accurate, does not change the fact that the final judgment and decree expressly retains jurisdiction and control over the procedures which require preparation of a proper EIS on the most expedient schedule practicable under the circumstances.

The Phase VI Stipulation dealt with the difficult question of what should be done in regard to on-going and future contracts. That Stipulation incorporates by reference D. Ex. 1r. That exhibit sets forth forty-three of the forty-four contracts which were awarded before this litigation commenced.[7] Each of those contracts and the degree of envi-

---

7. The 44th contract, No. 72–C–0170, was awarded June 14, 1972, for certain clearing at Osceola, Missouri. Contract No. 72–0107, for the relocation of Missouri State Highway 39 and Contract No. 72–0114 for a concept study for a visitors' center were also awarded subsequent to the filing of this case. These three contracts were awarded after full discussion with the Court.

ronmental impact, if any, which might result should the work be permitted pending the filing of a final EIS was the subject of detailed discussion at a conference with the Court on June 21–22, 1972. Col. Needham and his staff and several of the individual plaintiffs and counsel for all parties were present throughout those conferences. The Corps made available to the Court and to the parties and their counsel all relevant information in regard to the ongoing contracts and their status. The problems which related to land acquisitions were given equally careful consideration. The ability of the parties to reach the degree of agreement reflected by the Phase V Stipulation resulted from their willingness to anticipate how the Court would probably rule particular questions concerning various of the ongoing contracts and to adjust their respective positions accordingly. In other words, it can fairly be said that both sides, without waiving their legal positions, agreed and stipulated to matters and procedures to which they would not have agreed except for their mutual desire to facilitate the judicial determination and possible judicial review of the questions presented.

The Court again conferred with counsel on July 26, 1972. That conference resulted in the Supplemental Stipulation on Phase VI. In that final stipulation the parties recognized that their inability to reach full agreement in regard to the earlier Phase VI Stipulation "was primarily related to the extent of equitable relief, if any, which should be granted during the period of time the schedule stipulated in their Phase V Stipulation is being carried out." The parties were, however, able to agree in their supplemental Phase VI Stipulation upon additional limitations on actions which the federal defendants may have otherwise taken, excepting, of course, an order of this Court to the contrary. The federal defendants agreed that all future land acquisitions up to July 1, 1973 would be limited to the three exceptional circumstances stated in the supplemental stipulation.

Defendants' Exhibit 101(a) identified in the supplemental stipulation lists the future work that had been projected as of May 12, 1972. That future work anticipated the advertisement and awarding of 62 future contracts. The federal defendants agreed that the 48 contracts lined-out on that exhibit would not be accelerated to a date before July 1, 1973, unless otherwise ordered by the Court. It was also agreed that the three contracts for the procurement of power plant equipment (generators and accessories, governors, bridge cranes, gates and bulkheads, and gantry cranes) would be deferred until July 1, 1973, or until further order of court.

The July 1, 1973 deferment date is a most significant date because all parties agree that if the schedule set forth on the Stipulation on Phase V is timely complied with, an appropriate EIS will have been prepared and considered by the decision makers, including the Congress of the United States, prior to that time. Some contracts may, under the final judgment and decree, be awarded before July 1, 1973. The additional contracts which may be awarded before March 1, 1973, the scheduled date for the filing of the final EIS, involve five relocations of Missouri State Highways in Benton and Henry Counties; three relocations of St. Clair County roads and three relocations of Henry County roads. Contracts for the relocation of three cemeteries may be awarded prior to that time. The same thing is true in regard to five supply contracts for power equipment.

The environmental impact of the road relocations is obviously of a temporary nature. It is true that some 200 acres of wildlife habitat will be destroyed by newer and safer roads. At least part of the abandoned roadways, however, would revert back to vegetation and wildlife purposes. The relocations of the small cemeteries, many of which are family cemeteries in poor condition, is always a lengthy and delicate process. The envi-

ronmental impact of relocation of the cemeteries involved is minimal, and, in most instances, all persons concerned do not want an interruption of the projected action.

The supply contracts for power equipment involve several phases, the first of which is limited to the preparation of design. The design phase will be carried out offsite. Fabrication and installation is not scheduled in any substantial degree until after the EIS is to be filed and therefore would not have any significant environmental impact.

While there is some disagreement in regard to the amount of the cost of suspending or terminating on-going work, plaintiffs frankly recognize that millions of dollars would be involved either for suspending or terminating the work and for restarting the project in the event the decision makers, including the Congress of the United States, concluded to do so in light of its consideration of the final EIS.[8]

We are satisfied that under the final judgment and decree the defendants are required to postpone and to reschedule all future activity which may reasonably be postponed without incurring most substantial costs. The work which may go forward pending final EIS review will not have a substantial environmental impact upon the Osage Basin fish and fauna, including the paddlefish now in the river. Nor will the continuation of that work have any significant environmental impact upon the archaelogical and paleontological sites, the wildlife habitat for deer and turkey, the waterfowl habitat, including the Schell-Osage Wildlife area, or the society, agriculture or economics of the basin.

■ We find and conclude that no substantial environmental impact will

occur in regard to any of those areas until and unless the dam is actually closed. Until that should happen the paddlefish, for example, are free to swim where they will. The dam is not scheduled for closure until sometime in 1976, long after it is contemplated that an appropriate EIS will have been properly prepared and considered in accordance with law.

It is our judgment that the procedures provided for in the final judgment and decree, if and when complied with, will assure full compliance with NEPA and all other applicable law as promptly as is practicable under the circumstances. It is further our judgment that the issuance of a blanket injunction stopping all construction would not speed the preparation or enhance the probabilities that a sufficient EIS will be prepared. Under these circumstances, we believe that a proper balancing of the factors which must be given appropriate consideration under general equity principles requires that the most substantial costs incident to the termination or suspension of work to an extent greater than that provided in the final judgment and decree should be avoided.

V.

Plaintiffs concede that the question of what equitable relief should be presently granted must be determined in light of the particular circumstances of this case. Plaintiffs state on page 4 of their Phase VI reply brief that: "In determining the necessity of granting injunctive relief . . . it is necessary to consider the particular facts and circumstances of this case, including the importance of implementing [the declared policies of Congress] in light of the options or alternatives that would be precluded and the substantial environmental dam-

---

8. The model attached to plaintiffs' post-trial brief filed July 24, 1972 concedes that at least $2,895,455 would have to be expended to stop work and that at least $2,728,888 would have to be spent to restart the project. Plaintiffs also concede that only $1,171,318 would be saved should the decision makers deter-

mine to eliminate the present power feature contemplated for the dam. The defendants' estimates for termination, escalation and readvertisement (or suspension and escalation) are, of course, substantially higher than the costs conceded by the plaintiffs.

age that will necessarily and inevitably ensue if defendants are permitted to continue construction   .   .   .   ."

Plaintiffs' statement tends to suggest that a balance should be struck which would, under the circumstances, give appropriate weight to the various factors which must be considered. Plaintiffs, however, retreat from the implication of their statement. For under plaintiffs' view of the circumstances of this case, the only factor which plaintiffs contend should be given consideration is the public interest factor implicit in the implementation of Congressional declared policy. It is that single factor which plaintiffs insist must be given sole and paramount consideration.

Plaintiffs, of course, talk about "inevitable and substantial environmental damage" and they talk about "preclusion" of Congressional options and alternatives. But what they say is only talk because neither notion has any factual support under the circumstances of this case.

One simply cannot validly argue on the facts of this case that the continuation of *any* construction "will necessarily and inevitably [result] in substantial environmental damage." Substantial environmental damage can occur under the circumstances of this case only when the dam is closed and the Osage River is no longer a free-flowing stream.

Nor can it validly be argued that all construction must be immediately stopped in order to keep open the options and alternatives available to the Congress under the circumstances. Plaintiffs quite properly state on page 181 of their Comments submitted to the Corps of Engineers on July 31, 1972 (under the stipulated procedures) that the EIS should advise the Congress that it should give consideration to a total abandonment of the present project and to give consideration to the alternative "maintenance of the Osage River in a free-flowing state" in order to permit "the establishment of a refuge for the paddlefish and other elements in the North American fauna and flora associated with the habitats in and along large rivers." Plaintiffs there suggest that in their view "The upper Osage River appears to be uniquely suited to serve as such a refuge." And Congress may decide that plaintiffs are right about that matter.

■   But the point about the matter is that the power of Congress to choose one alternative or the other is not, as plaintiff argues, "precluded" by a final judgment and decree which would permit a carefully designed amount of construction to continue pending review by the Congress of an appropriate EIS. Plaintiffs' implicit concern that the ultimate judgment of Congress may be affected by the amount of previously authorized money that may actually be spent by the time it reviews the EIS is not a proper argument for the judicial forum. If plaintiffs believed that such an argument might have an improper effect on the ultimate Congressional decision, they should have commenced their action at an earlier point in time. Plaintiffs' arguments based upon the notion that the substantial environmental impact that will occur upon completion of the project can result before closure of the dam and upon the notion that Congressional options and alternatives are precluded are *factually untenable* under the particular circumstances of the case.

The sole remaining ground upon which plaintiffs' claim for total and immediate stoppage of the construction permitted by the final judgment and decree must be said to rest upon the validity of plaintiffs' argument that absolute priority must be given the implementation of Congressional policy factor. Plaintiffs state on page 13 of their post-trial brief that "it is our position that the nature and extent of the cost to defendants of suspending or terminating further work on the project pending further compliance of NEPA is not to be given priority over the public interest inherent in the preservation of an ade-

quate NEPA review, which can *only* be accomplished if injunctive relief is granted in this case." (Emphasis ours.) Plaintiffs really argue that the extent and nature of the cost of termination is of no substantial importance and that the top and single priority must, as a matter of law, be given the implementation of Congressional policy factor.

From a factual viewpoint, it is apparent that plaintiffs' paramount priority argument rests upon the assumption that all any court need to do in a NEPA case is to issue an injunction to stop construction and that compliance with NEPA will follow as a matter of course. The history of the *San Antonio Conservation Society* case establishes that the problem of obtaining agency compliance with NEPA is much more complicated. An injunction in a form substantially the same as that which plaintiffs would have this Court enter in this case was in fact issued and has been in full effect in the San Antonio case for well over a year. Compliance in that case with NEPA and other applicable law is no closer now than it was when that injunction was entered over a year ago. Indeed, the apparent result of that injunction has been a vigorous effort on the part of those who want the project to go forward to obtain Congressional reversal of the Court of Appeals of the Fifth Circuit decision in that case.[9]

Plaintiffs make clear that they do not believe that "the economic consequences" which would flow from a total stoppage of work can "justify abandoning [the priority] objective . . . [of] enforcing the declared policies of Congress." [Pls'. Phase VI Rep. Br., p. 12]. Plaintiffs argue that "If NEPA is to have any applicability to on-going proj-

ects . . . it is expected that there will be substantial financial losses associated with the delay inherent in implementing the NEPA review. If such financial losses, whether to private parties or to the federal government, were to be given paramount consideration, there would simply be no effective enforcement of NEPA." [Ibid, p. 12.] Plaintiffs really argue that the factor of obvious financial loss to private parties and to the federal government be given no consideration at all.

Plaintiffs have adamantly insisted throughout this litigation that the one and only way to insure compliance with NEPA is to order all work enjoined pending NEPA review. In their original brief on equitable relief (Phase VI), plaintiffs state that "if the decision makers are to have ample opportunity to implement NEPA . . . it is imperative that certain on-going and future contemplated activities leading to the completion of this project be enjoined . . . ." [p. 50]. At the bottom of the same page, plaintiffs make clear that the "certain" work to which they made reference was to be taken to mean "all" work "now being carried on [including] the letting of future contracts."

When the absolutism of their basic legal argument was challenged, plaintiffs conceded, as, indeed, they must, that Congress did not provide that plaintiffs are entitled to any sort of an injunction "as a matter of right" [Pl. Phase VI Rep. Br., p. 14]. Indeed, plaintiffs explicitly conceded that United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952), correctly states that "the sole function of an action for injunction is to forestall future violations" and that

---

9. It could, of course, be said that the San Antonio park has been "saved" as a result of the tangled litigation. But it is obvious that both the economic and environmental waste incident to that project will continue until a viable solution is found either in the courts or in Congress. Footnote 9 of the Fifth Circuit's opinion (446 F.2d at 1017) illustrates how hollow claims of "saving" a park may be. The public interest demands that better approaches and procedures be developed to deal with the Nation's belated recognition of its environmental problems, else political controversy engendered by litigation may produce what many would consider to be a substantial legislative retreat on the part of Congress.

such actions are "unrelated to punishment." Plaintiffs suggest that they "are not interested in punishing the Corps for sins past" [Pl.Post-Trial Br., p. 15], but it is most difficult to understand any other rationale to support plaintiffs' costly demands.

■ Once it is conceded that the Congress did not create a mandatory right to injunction for a NEPA violation, it becomes clear that general principles of equity are applicable and that application of those principles to this new type of case controls the exercise of the Court's discretion under the circumstances. The fundamental difficulty with plaintiffs' effort to make application of settled equitable principles to the circumstances of this case is their repetitive but unsupported assertion that "there is no assurance, and there can be no assurance at this time, that the impact statement will be either procedurally or substantively sufficient, regardless of the good faith efforts of all parties involved." [Pl. Phase VI Rep. Br., p. 9].[10]

In one sense, but only in a very narrow sense, may it be said that there can not be any assurance that the impact statement in its present state of preparation will be procedurally and substantively sufficient. For none of us possess the power to predict the future with absolute certainty. Presumably, the Congress sought to assure the people of the United States that appropriate impact statements would be prepared by all federal agencies without the necessity of judicial action and that those statements would be properly considered by the decision makers in accordance with the policy declarations of NEPA. But this and numerous other environmental cases establish that sometimes something more than the mere passage of a law is necessary to effect substantial change.

Plaintiffs' suggestion that the good faith efforts of the parties involved in this case are irrelevant to the question of whether the EIS will be procedurally and substantively sufficient flies in the face of the experience of the law. For that experience establishes that the orderly administration of most aspects of our government rests upon the good faith of the responsible · participants rather than upon coercion. Our constitutional system was based upon a candid recognition that men are not always angels and that the creation of a judicial branch of government was necessary to maintain a government of laws rather than of men. Those who cynically maintain that those words express only a political cliché have forgotten that Mr. Chief Justice John Marshall used exactly those words in Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803), as he was laying the foundation upon which the very structure of our delicate system of government rests.

Judicial experience establishes that in cases involving the applicability of new legislation to various agencies of the government, it is seldom necessary to issue a writ in assistance of the court's final judgment. The court's final decision is usually given a good faith acceptance and followed as the law of the land.

■ We are convinced that the demonstrated good faith of the defendants in this case is a most important factor to be considered in our determination of the relief to be granted. Our retention of jurisdiction affords the plaintiffs a prompt and adequate remedy to present any question that they may have in the future in regard to the sufficiency of the EIS. The manner in which the defendants have acknowledged their obligation to prepare an appropriate EIS, the manner in which they conducted their side of this litigation, their willingness to enter into the Stipulations, and their conduct in thus far complying with the procedures therein provided all are convincing evidence that the provi-

10. In their post-trial brief plaintiffs reiterate that "There can not . . . regardless of the good faith efforts of all parties involved, be any assurance at this time that the impact statement will be either procedurally or substantively sufficient."

sions in the final judgment and decree will fully protect the public interest and that the procedures are fair and just to all parties under the circumstances.

Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), presented the question of whether the administrator of the OPA was entitled, as a matter of right, to enjoin all persons in violation of the Emergency Price Control Act of 1942. The district court concluded that the Congress did not intend that an injunction be issued under any and all circumstances. The district court found that when the defendants' mistakes were brought to its attention, those mistakes were "at once corrected, and vigorous steps were taken by the Hecht Company to prevent recurrence of these mistakes or further mistakes in the future." The district court concluded that under those circumstances the issuance of an injunction would "have no effect by way of insuring better compliance in the future" and would be "unjust" and not "in the public interest."

The Supreme Court generally affirmed the district court. It indicated, however, that the district court should not have dismissed the complaint but rather, should have entered an order retaining the case on the docket with the right of the administrator, on notice, to renew his application for injunctive relief if violations recurred. Mr. Justice Douglas stated "It is indeed not difficult to imagine that in some situations that might be the fairest course to follow and one which would be as practically effective as the issuance of an injunction." We are convinced that the circumstances of this case presented that sort of situation.

There is absolutely no basis upon which this Court could presently make a finding that the EIS will be either procedurally or substantively insufficient. Indeed, the care and imaginative attention that the parties have given to the designing of procedures would seem to have incorporated every possible assurance that the EIS will be both procedurally and substantively sufficient. The parties have virtually eliminated questions which have delayed effective compliance with NEPA in other cases. Application of principles applied in reapportionment cases in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1963), and other reapportionment cases suggests that practical solutions be sought and applied to the type of complicated problems presented in this case.[11] We think also that this Court must keep in mind what was originally stated in United States v. Morgan, 307 U.S. 183, 194, 59 S.Ct. 795, 83 L.Ed. 1211, and repeated in Hecht Co. v. Bowles, *supra*. In regard to judicial review of administrative action, Mr. Justice Stone stated in *Morgan* that ". . . court and agency are not to be regarded as

---

11. Even in cases in which it has been determined that the plaintiff has a mandatory right to injunctive relief, the courts have, as a practical matter, afforded the defendant a reasonable opportunity to take corrective action. In United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940), for example, although the Supreme Court concluded that "this case does not call for a balancing of equities or for the invocation of the generalities of judicial maxims" [Ibid, p. 30, 60 S.Ct., p. 757], it nevertheless affirmed the district court's judgment which provided that: "In order that the City may face its problem and comply with its obligations under section 6 of the Raker Act, the court will make its injunction issuable forthwith, but effective six months from the date of its issue" [Ibid, p. 19, 60 S.Ct., p. 751–752].

Compare Oregon & Cal. R.R. v. United States, 238 U.S. 393, 439, 35 S.Ct. 908, 59 L.Ed. 1360 (1915), in which the Supreme Court indicated that the district court should design a decree which would contemplate Congressional action within a period of "not less than six months." These and other cases reflect the experience of the law that the play at the joints necessary to make representative government work is not infrequently provided by judicial postponement of a confrontation of raw power for a reasonable period of time.

wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute. Court and agency are the means adopted to attain the prescribed end . . . . Neither body . . . can rightly be regarded by the other as an alien intruder, to be tolerated if must be, but never to be encouraged or aided by the other in the attainment of the common aim."

On July 19, 1972, in Aberdeen R. Co. v. SCRAP, —— U.S. ——, 93 S.Ct. 1, 34 L.Ed.2d 21 Mr. Chief Justice Burger refused to stay a preliminary injunction granted by a three-judge court in a NEPA environmental case. The Chief Justice deferred to the "balancing of the equities" as reflected by the "danger to the environment outweighing the loss of income and consequent financial threat to the railroads" as that evaluation had been collectively made by the three-judge court.

While the decision in the Aberdeen R. Co. v. SCRAP case reflects only the view of one member of the Supreme Court, we are confident that the Chief Justice stated the applicable law when he said that "The decisional process for judges is one of balancing and it is often a most difficult task."

We also believe that those who would routinely and automatically seek to have courts issue blanket injunctions in every environmental case on the theory that such action is the only available means to attain compliance with the mandate of NEPA should consider the following language from Mr. Chief Justice Burger's opinion in Aberdeen R. Co. v. SCRAP:

Our society and its governmental instrumentalities, having been less than alert to the needs of our environment for generations, have now taken protective steps. These developments, however praiseworthy, should not lead courts to exercise equitable powers loosely or casually whenever a claim of "environmental damage" is asserted. The world must go on and new environmental legislation must be carefully meshed with more traditional patterns of federal regulation.

We have struck the balance in accordance with what we believe is in the public interest. We are grateful that neither the plaintiffs nor the defendants apparently considered this Court, to use Mr. Justice Stone's language in *Morgan*, to be an "alien intruder." We are hopeful that the manner in which counsel and the Court have approached our difficult task will attain the end contemplated by NEPA and other applicable law.

## VI.

### FINDINGS OF FACT

A. *Jurisdiction and Description of the Parties*

1. The plaintiff Environmental Defense Fund, Inc., (EDF) is a nonprofit, public-benefit membership corporation organized under the laws of the State of New York. Its principal offices are located in East Setauket, Long Island, New York. It has 32,000 members nationally, some of whom reside in Missouri, and all of whom have voluntarily contributed to the corporation. EDF's purpose is to further the wise use, preservation and enhancement of the natural environment including, but not limited to, the preservation of rivers, river basins, wildlife, and the quality of natural resources.

2. Certain members of EDF allege and claim, and some of them have testified or submitted undisputed affidavits to show (1) they presently use the environs of the Osage River Basin for hunting, boating, fishing, wildlife observation, photography, as well as other uses, and (2) that such uses would be altered, impaired, and adversely affected by construction of the Harry S. Truman Reservoir project. (P. Ex. 161, 166, 167, 168, 169, 171, 172 and 174; see also Tr. 17–18.)

3. The plaintiff Missouri Chapter of the Wildlife Society is a duly authorized chapter of the parent organization which is a non-profit corporation organized under the laws of the District of Columbia. The Missouri Chapter is a professional organization of 260 members who are ecologists, biologists, and other scientists and naturalists concerned with the proper management, preservation, and enhancement of wildlife and wildlife habitat.

4. Certain individual members of the Missouri Chapter of the Wildlife Society claim, and have produced evidence to show they use the environs of the Osage River Basin for recreational and professional pursuits and claim, and have produced evidence to show, that such uses would be altered, impaired, and adversely affected by the construction of the Harry S. Truman Reservoir Project. (P. Ex. 161, 162, 163, 165, 170; Tr. 140–141.)

5. The organizational plaintiffs bring this action on behalf of themselves, their members, and other individuals who have an interest in the protection and enjoyment of the reservoir area and ecosystems in their present state, including those members who use and enjoy the Osage River, its bottomlands, and its environs in their present state for recreational and professional pursuits, including but not limited to, fishing, hunting, camping, nature observation and study photography, and aesthetic appreciation.

6. The plaintiff Marion Barnes, Osceola, Missouri, is a farmer whose farm is slated to be purchased or condemned by the defendants for the purpose of inundation by the proposed Truman Reservoir. Barnes has derived his livelihood from his farm situated in the Valley of the Osage since 1941 and he wishes to have his land preserved in its present state and to continue to earn his livelihood therefrom.

7. The plaintiff J. S. Whitaker, Deepwater, Missouri, is a banker in the town of Deepwater, a substantial portion of which will be inundated by the proposed reservoir. Whitaker was born on a farm on the South Grand River which he owns. Whitaker also owns another farm on the Osage River. Both of Whitaker's farms are to be purchased by the defendants for purposes related to the Truman Reservoir. His family has lived in the valley for four generations and he wishes to preserve his farms and his land in their present state.

8. The plaintiffs Leo A. Wisner and his son, Paul Wisner, are farmers. Leo Wisner owns farmland and Paul Wisner rents farmland that would be purchased by the defendants for purposes related to the Truman project. Both Wisners wish to preserve their farmland in its present state and to continue to derive their livelihood therefrom.

9. The plaintiff Leland Payton, Columbia, Missouri, is an interpretative environmental photographer, writer, and artist. Payton frequently uses the Osage River Basin for floating, fishing, photography, studying, and as a subject for articles about the Osage River and its environs. For both personal and professional reasons Payton wishes the river and its environs preserved in their natural state. His recreational and professional uses of the Basin would be altered, impaired, and adversely affected by the construction of the Truman Reservoir Project.

10. The defendant Corps of Engineers is an agency of the United States and a part of the United States Army. It is charged by statute with the accomplishment of certain civil functions of the Department of the Army, including the construction of dams and reservoirs. The Corps maintains offices and personnel at the Federal Building, Kansas City, Missouri, in the Western District of Missouri, Western Division. Those offices have the immediate supervision of, and responsibility for construction of the Harry S. Truman Reservoir Project with which this suit is concerned.

11. The defendant, Robert F. Froehlke is Secretary of the Army and

as such exercises administrative supervision of the entire Department of the Army, including the Corps of Engineers and its agents, employees, and offices mentioned in paragraph 10 of these findings. He is an officer of the United States.

12. The defendant General Frederick B. Clarke is Chief of Engineers of the Corps of Engineers of the United States Army and therefore exercises administrative supervison over the personnel and offices referred to in finding 10. He is an officer of the United States.

13. There are 173 defendants-intervenor in this case. They include four agencies of the State of Missouri, five county governments, seven towns, two not-for-profit associations, six contractors and trade associations, 12 labor unions, or labor councils, and 140 business and land-owning residents of the area. The defendants-intervenor allege and claim that each has either economic or environmental interests that would be adversely affected if construction of the Truman Project were to be suspended or terminated.

14. The amount in controversy, exclusive of interests and costs, exceeds $10,000.00.

B. *The River, the Project and Its Environmental Impacts*

15. The Osage River is the third largest river in the State of Missouri; only the Mississippi and the Missouri rivers are larger. The Osage River spans a transitional zone between prairies and uplands. There are at least two edge environments in the area involved here. One is where timber of the upland meets the bottomland, and the other is where bands of timber immediately adjacent to the rivers and the tributaries meet the bottomlands. The habitats of the Osage Basin involved here are rich and important for many plants and animal species which are native to the area; they range from flood plain deciduous forests to marshes and natural ox-bow lake areas. The Osage River provides important and significant habitat for many species of fish, including the paddlefish. The bottomland ecosystems of the Osage River contain large areas of important and significant habitat for game animals, including deer and wild turkey, and particularly in the Schell-Osage Wildlife Area, for waterfowl.

16. This suit arises out of a water resource project which defendants are constructing on the Osage River in Missouri known as the Harry S. Truman Dam and Reservoir Project. (D. Ex. 1n; P. Ex. 204). The Truman project was initially authorized by Congress by the Flood Control Act of 1954, September 3, 1954, 68 Stat. 1256, as the Kaysinger Bluff Dam and Reservoir, Osage River, Missouri (D. Ex. 1, Par. 19; D. Ex. 1n). According to the original project document, House Document No. 549, 81st Cong., 2d Sess., the basic purpose of the project was to alleviate problems of flooding of towns and agriculture lands along the Osage River, the Missouri River, and the Mississippi River (P. Ex. 13a; D. Ex. 1d). The Flood Control Act of 1962, October 23, 1962, 76 Stat. 1180, reauthorized the project to include conservation, storage for power, and recreational purposes as recommended by the Chief of Engineers in House Document No. 578, 87th Cong., 2d Sess., the supplemental project document.

17. The Truman Dam is currently under construction by private contractors pursuant to contracts with the Corps of Engineers. The dam will consist of an earth fill embankment about 5,000 feet in length, a concrete structure slightly less than 1,000 feet long, and a dike 7,500 feet in length. Maximum height of the dam will be 96 feet above the valley floor. The reservoir will inundate 209,300 acres at full flood control pool and 55,600 acres of land at conservation or multi-purpose level; the reservoir's capacity is 5,202,000 acrefeet at flood control level. The reservoir will extend upstream into portions of Bates, Henry, Hickory, St. Clair and Vernon Counties, Missouri. The dam would be

located in the vicinity of Warsaw, Missouri, immediately upstream from the Lake of the Ozarks, the reservoir created by Bagnall Dam.

18. The current total estimated Federal Cost (Ultimate) of the project is $234,692,000; current total estimated Appropriation Requirements are $294,000,000.

19. On October 30, 1970, the Corps entered into a $36,294,652 contract for Stage III of the dam construction, which includes primarily construction of the remainder of the main embankment excepting the closure section, construction of the powerhouse intake and substructure, the spillway, and related structures. This contract was 26.7 percent complete as of February 29, 1972, and 31.2 percent as of April 30, 1972.

20. It is estimated that as of June 30, 1972, total estimated costs expended were $74,000,000 with the project 22 percent completed. (Finding 26). Of this amount approximately $20,000,000 has been expended directly on the dam and dam site itself.

C. *The Environmental Effects of the Project*

21. By inundation, the multi-purpose pool of the Truman project would destroy approximately 248 linear miles of the free-flowing Osage River and its tributaries and another 30 miles of the tree-bordered Osage River channel containing slack water upstream from the Lake of the Ozarks (Stip. 11).

22. Substantial portions of the river and streams that would be wholly or partially impaired or destroyed by the project have substantial scenic or aesthetic value. If the project were to be constructed, those portions of the river and streams and surrounding environs having substantial scenic or aesthetic value would be replaced by a large man-made lake, a type of facility which is becoming increasingly common in Missouri and in the nation generally.

23. The Harry S. Truman Dam and Reservoir project, as presently planned, will cause significant environmental impact on the following areas:

(a) The Osage River Basin fish fauna, including impacts on the paddlefish, blue catfish, striped bass and walleye;

(b) Archaeological and paleontological sites;

(c) Wildlife habitat, including habitat for deer and turkey, with resulting impacts on populations of wildlife species;

(d) Waterfowl habitat, including the Schell-Osage Wildlife Area, and other wetlands in the Osage Basin;

(e) Potentiality on mussels in the Osage River and tributaries; and

(f) Society, agriculture, and economics.

24. The paddlefish is a unique element in the fish fauna of the Osage River, belonging to an ancient family of fresh water fishes represented by only two living species, *Polyodon spathula*, the paddlefish of the Mississippi Valley, and *Psephurus gladius*, of the Yang Tse Valley in China.

25. The Osage River Basin supports a large stable population of paddlefish above Bagnall Dam. The Lake of the Ozarks has a large resident population with the upper Osage River having a small resident population. The resident population in Lake of the Ozarks migrates from the lake to the upper Osage River during its spawning run and then returns to the Lake of the Ozarks following spawning.

26. The transient population of paddlefish in the Osage River in Missouri apparently results from adequate conditions for reproduction and spawning along several miles of the river and tributaries immediately upstream from the Lake of the Ozarks, and favorable conditions for survival and growth of resident paddlefish in the lake itself.

27. The Truman Reservoir will inundate those areas where paddlefish are known to spawn in the Osage River.

28. Areas equivalent to those where paddlefish now spawn are not known to exist in the Osage Basin beyond the proposed Truman Reservoir. Thus, completion of the Truman project would substantially reduce the paddlefish population now present and thereby terminate the paddlefishery there, unless methods can be developed for artificial propagation or artificial spawning grounds, or development of natural spawning grounds in the Sac arm, Pomme de Terre arm, or Osage headwaters can be accomplished between now and impoundment scheduled in 1976 and afterwards. Evidence was adduced that such artificial techniques for maintenance of the present paddlefish population are not known at the present time and have yet to be developed and that such techniques probably could not be developed between now and the proposed date for closure of Truman Dam and filling of the reservoir. The evidence suggests that it takes many years for paddlefish to become sexually mature. This distinguishes them from many other fish which have been subjected to artificial propagation programs, such as the salmon which mature in a few years.

29. The North American paddlefish was apparently formerly abundant but is now depleted over most of its former range. The paddlefish is of significance in biological research. Even today with the supply of paddlefish from the Osage Basin available, shortages of paddlefish for research have already occurred. The paddlefish population of the upper Osage Basin, then, is important for the continuation of such medical research.

Defendants adduced evidence which indicated that Upper Missouri River sources in the Dakotas have furnished some paddlefish for scientific purposes, nationally and internationally, from the early 1960's to date.

30. The Osage River in the area of the proposed Truman Reservoir supports a diverse fish fauna, reflecting the diversity of habitats in the area. An effect of impoundment on the fish fauna in the area impounded would be reduction in faunal diversity. Some of the Osage River fish species or sub-species will not continue in the Truman Reservoir. The fish faunal complex now existing in the Osage River will be altered and reduced by impoundment.

31. The Truman Reservoir site presents an example of a productive environment with an abundance of wild forms, both plant and animal. This area provides the necessary habitat elements for many species of plants and animals as it has a diversity of cover types, such as openings in bottom woodland, tree covered flood plains in grasslands, cultivated areas, hedges, streambank vegetation and scattered open vegetated spots.

32. Deer and turkey were eliminated from the proposed reservoir area by human development considerably before the authorization of the Truman project in 1954. People throughout the state, however, requested the Department of Conservation to release deer and wild turkeys in their areas, including the reservoir area and since 1965 Benton County has been among the top five counties in the number of deer killed.

33. The major portion of the deer habitat in the counties in the prairie portion of the reservoir lie within the areas along the streams is damaging to the reservoir. Removal of the timbered area along the streams is damaging to the deer resource. If the bottomlands are flooded long enough to kill the timber, the general population of deer and other forest game species will be diminished. The multi-purpose pool of the reservoir will, of course, eliminate all existing stands of timber along the present Osage River channel and it is likely that occasional flooding from the flood control pool will be of sufficient duration to kill additional timber.

34. Similarly, due to a reduction in the number of plant communities in the reservoir area through flooding occasioned by the reservoir, wild turkey populations, while they will probably not again be eliminated, may be reduced be-

low the point where hunting can be allowed.

35. The Schell-Osage Wildlife Area is located in the Osage River bottoms in Vernon and St. Clair Counties and covers 8,633 acres. This management area contains 1,570 acres of bottomland which is flooded annually for duck hunting. It provides public hunting, fishing, and breeding, resting, and feeding grounds for waterfowl. Two permanent reservoirs totalling 816 acres, two bottomland lakes and nine miles of Osage River Bank are available for fishing. 5,500 acres of farmland are available for hunting rabbits, quail, doves, and other small game.

36. Pin oak timber, one of the most valuable food producing trees, is more susceptible to injury by flooding than some other bottomland species. There would be substantial mortality if a flood equal to the 1951 flood were to occur.

37. Potential deterioration of the Osage Basin habitat through the operation of the Truman Reservoir with resulting loss of a significant amount of mast-producing pin oak timber in the Schell-Osage Wildlife Area would likely reduce in substantial numbers the population of more than 100,000 ducks that now winter there annually.

38. Prolonged inundation of portions of the Schell-Osage Wildlife Area by the operation of the Truman Reservoir could have a substantially adverse effect on the resident population of 700 Canada geese.

39. The flock of giant Canada geese at the Schell-Osage Wildlife Area is of significant importance because young birds from this flock are provided to Canada, Minnesota, North and South Dakota, Iowa, and Kansas. The effect of the Truman Reservoir on the fate of this flock is not predictable. If the reservoir is not built there are no known limitations on the size of the flock of either the giant Canada geese or the mallard population at Schell-Osage. The uniqueness of the Schell-Osage area, under proper management techniques, is

responsible for a potential of growth in these flocks.

40. The areas to be flooded permanently by the multi-purpose pool, and occasionally by the flood-control pool, of the Truman Reservoir contain a number of significant archaeological and paleontological sites.

41. None of the "Environmental Effects of the Project" will occur in any substantial way until dam closure and start of water impoundment, which are not scheduled until the year 1976.

42. Plaintiffs have presented what they described as "Extremely serious questions regarding this project's overall benefit-cost ratio, and in particular there are serious questions regarding its hydro-power benefits, its claimed fish and wildlife benefits, its recreational benefits, its flood control benefits, and the flood control policies upon which it is based." (See Plaintiffs' Proposed Finding of Fact No. 142, submitted to the Court on July 24, 1972, (resubmitted as Finding of Fact No. 41 on August 3, 1972) for the language quoted. See also Plaintiffs' Proposed Findings of Fact Nos. 134–141, submitted July 24, 1972, and the recorded references there cited for a detailed statement of plaintiffs' position.)

The Court permitted the plaintiffs to call five witnesses, who testified and were extensively cross-examined in regard to the questions presented. The parties thereafter agreed, in accordance with their stipulation filed May 26, 1972, that "the need for further oral testimony from either plaintiffs or defendants may be dispensed with." Under that stipulation it was stipulated that upon "the admission into evidence of all the plaintiffs' and defendants' affidavits, summaries and documents, there will be significant environmental impact as a result of this project as presently planned" in those areas which we have stated in Finding 23 above. (That finding was copied directly from paragraph 1 of the partial stipulation of May 26, 1972). It is therefore unnecessary to

make any detailed findings of fact in respect to the question of "overall benefit-cost ratio," "hydropower benefits," "fish and wildlife benefits," "recreational benefits," "flood control benefits," and the "flood control policies upon which it is based," as stated in Plaintiffs' proposed finding.

D. *Administrative Actions*

43. The chronology of administrative and congressional actions in regard to the Truman Reservoir are accurately set forth in detail in the affidavits of Paul D. Barber, United States Corps of Engineers, D. Ex., 1, et seq., and are incorporated in this finding by this reference.

44. The second affidavit of Paul D. Barber, Chief, Engineering Division, Kansas City District, United States Army Corps of Engineers, D. Ex. 77, et seq., sets forth the detailed facts of administrative actions by the Corps of Engineers, including actions with respect to the preparation of an EIS for this project and others in the Kansas City District Office. That data is incorporated in this finding by this reference.

45. On February 10, 1972, the Corps awarded a contract to Midwest Research Institute in the amount of $38,743 for the compilation of data to be used for the preparation of the EIS.

46. The Corps has not prepared either a draft or final environmental impact statement on the Truman project. The draft statement is scheduled to be completed by September 15, 1972; the final statement is scheduled to be completed by March 1, 1973; in compliance with the agreement of the parties on EIS scheduling, as approved by this Court.

VII.

CONCLUSIONS OF LAW

A. *Jurisdiction and Standing*

1. This suit arises under the National Environmental Policy Act, 42 United States Code, §§ 4321 et seq., (NEPA), and other federal laws cited in plaintiffs' complaint.

2. This Court has jurisdiction of the subject matter by virtue of 28 United States Code, § 1331 and 5 United States Code, §§ 701–706.

3. This Court has jurisdiction of the persons of the two individual federal defendants by virtue of 28 United States Code § 1391(e). Under the circumstances, it is not necessary to determine whether defendant Corps of Engineers may or may not be a suable entity.

4. The defendants concede and the Court finds that at least one of the plaintiffs has standing to maintain this suit under NEPA.

5. Plaintiffs have relied on other federal laws than NEPA. It is not necessary for this Court to decide whether (a) plaintiffs have standing, under those laws, or (b) whether they may assert a cause of action under any of those laws because, as plaintiffs concede, any relief possible under those claims would not exceed the relief to be granted under NEPA at this time. The question, for example, of to what extent, if any, the requirements of the Fish and Wildlife Coordination Act, 16 United States Code §§ 661 et seq., may be applicable may be presented at some later stage of this case and need not now be decided.

B. *Application and Requirements of NEPA*

6. The Harry S. Truman Dam and Reservoir Project is a major federal action significantly affecting the quality of the human environment. NEPA is therefore applicable to all federal action, including proposals for appropriations, pertaining to the Truman project arising after the effective date of NEPA, January 1, 1970.

7. Defendants have not, as yet, to the fullest extent possible, interpreted and administered their policies, regulations, and public laws relating to the Truman Dam and Reservoir project in accordance with the policies set forth in Section 101 of NEPA, 42 U.S.C. § 4331.

8. Defendants have identified and developed methods and procedures which

they have agreed to follow which, if followed, will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations, in connection with the Truman Dam and Reservoir project. Retention of jurisdiction will assure that the required methods and procedures will be followed.

9. The defendants have not completed their preparation of the "detailed statement" required by § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), and therefore cannot be said to be in present compliance with that section of the applicable law.

10. The defendants have not as yet completed their study, and accordingly have not as yet developed and described possible alternatives to recommended courses of action with regard to the proposal for continued construction of the Truman Dam and Reservoir project as required by § 102(2)(D), 42 U.S.C. § 4332(2)(D). The circumstances relating to this project require that such a study be made. The procedures agreed to and directed by our order provide for compliance at the earliest practicable date.

11. It is not necessary, and we therefore do not reach, the questions of whether the defendants may be in violation of the Interim Guidelines of the Council on Environmental Quality, 35 Fed.Reg. 7390 (April, 1970), the Final Guidelines of the Council on Environmental Quality, 35 Fed.Reg. 7390 (April, 1970), the Final Guidelines of the Council on Environmental Quality, 36 Fed. Reg. 7724 (April, 1971); their own internal regulations and procedures, including an engineering circular numbered EC 1120–2056, Executive Order No. 11514, 35 Fed.Reg. 4247 (March, 1970), or their own final regulations published as Engineer Regulations Preparation and Coordination of Environmental Statements, 37 Fed.Reg. 2525, 2526, Secs. 5e, 5j, 8b, 11a(2) and 14d, for reasons similar to those stated in our conclusion 5.

12. Paragraph 16 of plaintiffs' complaint alleged that this Court has jurisdiction to grant declaratory relief pursuant to 28 United States Code, §§ 2201 and 2202. Plaintiffs' proposed suggestions filed July 24, 1972, proposed a conclusion of law in that regard. However, plaintiffs' proposed conclusions of law filed August 3, 1972 did not request such a conclusion.

Although plaintiffs have apparently withdrawn any suggested conclusion that this Court exercise its discretionary declaratory judgment jurisdiction, plaintiffs in their August 3, 1972 proposed conclusions nevertheless carry over three suggested conclusions which seek declarations as to what should be included in the impact statement in order to comply with NEPA. (Proposed conclusions 20, 21 and 22 of plaintiffs' August 3, 1972 submission are substantially identical with conclusions 35, 36, and 37 as proposed in plaintiffs' submissions filed July 24, 1972.)

Even if plaintiffs' apparent withdrawal of its proposed conclusions requesting declaratory relief was inadvertent, we indicate that we would not exercise our discretion under the circumstances of this case. The defendants have demonstrated their good faith and their willingness to voluntarily comply, under appropriate judicial supervision, with the applicable law. We have no reason to believe that the defendants will not comply with the applicable law.

Should plaintiffs wish to later contend that the impact statement does not comply with applicable law they may do so under the procedures directed by our judgment and decree.

VIII

Accordingly, the Clerk is directed to enter the following

FINAL JUDGMENT AND DECREE

WHEREFORE, PREMISES CONSIDERED, IT IS BY THIS COURT THIS 13th DAY OF SEPTEMBER,

1972, Considered, Ordered, Adjudged and Decreed:

1. The Court orders compliance by the parties with Stipulations heretofore entered into, filed, and approved by the Court, all of which are hereby incorporated in this final judgment and decree by this reference.

2. Plaintiffs' request and prayer for temporary and permanent injunction, and all other relief, other than that provided above, should be and the same is hereby denied without prejudice.

3. Jurisdiction of this cause is expressly retained in order that all parties may, by appropriate motion, obtain enforcement of the procedures provided in the Stipulations, including but not limited to the question of whether the contemplated EIS, when prepared in final form, does in fact and in law comply with NEPA and all other laws which may be applicable.

## ON MOTION FOR INJUNCTION PENDING APPEAL

Although plaintiffs' pending motion for an injunction pending appeal is expressly filed pursuant to Rule 62(c) of the Rules of Civil Procedure, it is apparent that such motion again seeks to have this Court "grant an injunction against the construction of the Truman Dam" in the same blanket form which we found and concluded plaintiffs were not entitled when we decided this case on the merits. Plaintiffs' suggestion that the "certain financial outlays by defendants [which] will be necessary upon termination or suspension of work . . . are simply necessary expenditures to assure meaningful compliance with NEPA" is but a reiteration of plaintiffs' rejected argument on the merits.

■ In light of plaintiffs' prior filing of their notice of appeal on September 21, 1972, four days before they filed this pending motion, it is obvious that this Court may not properly treat plaintiffs' pending motion as a motion to amend the judgment and thereafter alter its determination on the merits. Juris-

diction on the merits is now in the Court of Appeals. See Ideal Toy Corporation v. Sayco Doll Company, (2 Cir., 1962) 302 F.2d 623, 625; and Turner v. HMH Publishing Co., (5 Cir., 1964) 328 F.2d 136, 137.

Establishment of "probable grounds for appeal" does not meet the standards applicable to Rule 62(c). Hovey v. McDonald, 109 U.S. 150, 161, 3 S.Ct. 136, 27 L.Ed. 888 (1883), shows that the substance of present Rule 62(c) was introduced into federal equity procedure at least as early as 1878 by the Supreme Court's promulgation of old Equity Rule 93. Cumberland Tel. & Tel. Co. v. Louisiana Pub. Serv. Comm., 260 U.S. 212, 219, 43 S.Ct. 75, 67 L.Ed. 217 (1922), cited by the Advisory Committee on Rules in its Note on Rule 62(c), dealt with a stay from a three-judge court, but noted that the purpose of what had then become Equity Rule 74 was maintenance of the *status quo* of the litigation in exceptional cases.

Long v. Robinson, (4 Cir., 1970) 432 F.2d 977, 979, reviewed and summarized the applicable principles controlling the exercise of Rule 62(c) discretion as stated in numerous cases by stating that "a party seeking a stay must show (1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." [Ibid at 979].

■ We do not believe it likely that the plaintiffs will prevail on the merits of their argument that Congress, in effect, intended that NEPA plaintiffs have a mandatory right to a blanket injunction regardless of the circumstances of a particular case. We obviously do not believe that plaintiffs will suffer irreparable injury under factual circumstances of this particular case in light of the relief granted them by our final judgment and decree. Other parties, including the public, would be substantially damaged by granting the blanket re-

lief plaintiff seeks pending appeal. And, for reasons we fully stated on the merits, we are convinced that the public interest would not be served should we grant to plaintiffs precisely the form of blanket relief pending appeal which we refused to grant them on the merits.

We do not reach plaintiffs' request that they be required "to post only nominal security." We state for the benefit of the Court of Appeals that had we reached that question we would not have ruled it without the benefit of a full plenary evidentiary hearing. We do not believe that the broad general language of the cases upon which plaintiffs rely in regard to this point may properly be applied to the circumstances of this case without further careful factual inquiry.

For the reasons stated, it is

Ordered that plaintiffs' motion for an injunction pending appeal should be and the same is hereby denied.